08727/93133-NES

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## EASTERN DIVISION

| | |
|---|---|
| THE ASSOCIATION OF CULTURAL EXCHANGE ORGANIZATIONS, INC., | |
| Plaintiff, | |
| v. | Case No. _____ |
| MIKE POMPEO, Secretary of State of the United States; CARL RISCH, Assistant Secretary, Bureau of Consular Affairs; MARIE ROYCE, Assistant Secretary of State, Bureau of Educational and Cultural Affairs; MATT LUSSENHOP, Principal Deputy Assistant Secretary, Bureau of Educational and Cultural Affairs; KEVIN SABA, Managing Director, Office of Private Sector Exchange; and The UNITED STATES DEPARTMENT OF STATE, | |
| Defendants. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COMES NOW Plaintiff The Association of Cultural Exchange Organizations, by and through its undersigned counsel, and sues Defendants, MIKE POMPEO, Secretary of State of the United States; MARIE ROYCE, Assistant Secretary of State, Bureau of Educational and Cultural Affairs; KEVIN SABA, Managing Director, Office of Private Sector Exchange; CARL RISCH, Assistant Secretary, Bureau of Cultural Affairs; MATT LUSSENHOP, Principal Deputy Assistant Secretary, Bureau of Educational and Cultural Affairs; and The UNITED STATES DEPARTMENT OF STATE, and alleges as follows:

08727/93133-NES

# I. INTRODUCTION

1.      This lawsuit is brought by The Association of Cultural Exchange Organizations, Inc. ("ACEO"), a non-profit corporation organized under the laws of the State of Washington. A copy of ACEO's Articles of Incorporation and Bylaws are respectively attached hereto as **Exhibits A** and **B** and are hereby referred to and incorporated herein by reference. ACEO's members are small business entities, as defined by the Small Business Administration, which act as sponsors in connection with the U.S. Department of State's Exchange Visitor Program. ACEO brings this lawsuit to challenge sanctions imposed by the U.S. Department of State ("Department") upon certain of its members on or about August 13, 2019 and renewed against its members by e-mail on September 16, 2020, and for a declaration that the Department must follow proper procedure in promulgating and enforcing rules which govern its Exchange Visitor Program.

2.      The members of ACEO are sponsors of exchange programs operated through the Department's Exchange Visitor Program ("EVP"). Each year, ACEO members sponsor thousands of foreign nationals in various program categories to participate in exchange programs in the United States.

3.      The sanctions in this case arise from the Department's arbitrary and capricious finding that certain of ACEO's members violated EVP regulations. As detailed further below, the flawed "investigation" that led to the Department's action in this case resulted in sanctions that are arbitrary, capricious, and a violation of ACEO's members' right to due process.

4.      The cornerstone of the Department's decision is a finding that ACEO's members violated program regulations set forth at 22 CFR Part 62, et seq., but the Department has failed to specify the nature of the putative violations.

08727/93133-NES

5.     The Department based its sanction decision upon a flawed data collection conducted by the Kentucky Consular Center from June 2018 through January 2019, in which the Kentucky Consular Center contacted several hundred U.S. corporate entities that served as host organizations for intern and training program participants.

6.     ACEO believes that this data collection undertaken by the Kentucky Consular Center was unlawful, as it does not appear that the Office of Management and Budget approved such data collection as required by the Paperwork Reduction Act.

7.     ACEO members have also confirmed that the information obtained by the Kentucky Consular Center was often collected from individuals having no knowledge of or involvement with the Exchange Visitor Program and who were not authorized to speak on behalf of their host organizations regarding the Exchange Visitor Program.  ACEO members have also confirmed that the individuals conducting the data collection on behalf of the Kentucky Consular Center were inconsistent in the questions they asked the individuals at the host organizations, many of whom just happened to answer the phone.

8.     ACEO believes that the individuals conducting this data collection on behalf of the Kentucky Consular Center were not adequately qualified, trained, or supervised while performing that work, and that the data collection process was so flawed as to render all information collected worthless for programmatic review purposes, for the consideration or imposition of any sanction, or in connection with any demand for remedial action against program participants.

9.     The Department has acted in an arbitrary and capricious manner in sanctioning ACEO members based solely upon this unlawful data collection, as the Department is aware of the flaws with this data collection based upon site visits that Department officials have conducted

08727/93133-NES

with employers identified as being allegedly problematic in the Kentucky Consular Center work product; yet when Department officials inspected the hosting facility they could find no issues, problems, or regulatory violations.

10.    Regardless, on or about August 13, 2019 and solely in response to the Kentucky Consular Center's data collection, the Department issued approximately 32 "Letters of Concern," which direct sponsors to conduct site visits to specified hosting entities and provide those hosting entities with training regarding the terms and conditions of the Exchange Visitor Program and to verify that these host entities meet the requirements of the Exchange Visitor Program.  Such sanction is arbitrary and capricious, not based in fact, and in many circumstances involves an impossibility of performance as many of the entities that the Department has directed sponsors to train will have no future involvement with the EVP.

11.    The "Letters of Concern" issued in August 2019 as a result of the flawed Kentucky Consular Center's data collection advise ACEO's member small business sponsors that they have 90 days to complete these site visits and explicitly threaten further administrative sanctions should these sponsors fail to comply.  Such letters were re-issued to ACEO's member small business sponsors on or about September 16, 2020, and again require compliance within 90 days of each sponsor's receipt of such letter.

12.    To comply with this directive, ACEO anticipates that its members will have to conduct more than 325 site visits and "training sessions" at an average cost of some $3,000 per visit/session, with the costs being borne solely by ACEO'S members.

13.    Thus, without an adequate basis to form a belief as to whether a regulatory violation has actually occurred, and in violation of the Administrative Procedure Act, the Department, acting by and through its Office of Private Sector Exchange, is imposing what is

tantamount to a financial penalty in excess of one million dollars on small sponsors that conduct

the Department's cultural exchange programs.

14.     The imposition of such penalties against ACEO's members significantly damages

these smaller sponsors' ability to carry out their regulatory duties for their current participants on

a day-to-day basis.

## II. STATEMENT OF FACTS

Exchange Visitor Program Background

15.     Congress established the Exchange Visitor Program in 1961 with the goal of

promoting educational and cultural exchanges between the people of the United States and other

nations. *See* Mutual Educational and Cultural Exchange Act of 1961, Pub. L. 87-256, § 101, 75

Stat. 527 (codified at 22 U.S.C. § 2451). The EVP authorizes a range of educational and cultural

exchange programs for foreign visitors, including "work-based" occupational training programs

designed to provide "on-the-job exposure" to American techniques, methodologies, and

expertise. *See* 22 C.F.R. § 62.2; *see also* 22 U.S.C. § 2452(a)(1)(B)(ii) (authorizing exchange

programs for "trainees").

16.     Though oversight of the EVP rests with the Department's Bureau of Educational

and Cultural Affairs, Office of Private Sector Exchange, the programs themselves are "facilitated

– indeed, largely conducted – by Agency-designated program sponsors." Exchange Visitor

Program, Final Rule, 58 Fed. Reg. 15180 (Mar. 19, 1993). To become a sponsor, an organization

must apply for and obtain designation from the State Department. *See* 22 C.F.R. §§ 62.5, 62.6.

17.     Under EVP regulations, the State Department's Office of Private Sector Exchange

may impose sanctions against a program sponsor if it finds that the sponsor engaged in one or

more specified "reason[s] for sanctions." *Id.* § 62.50(a).

08727/93133-NES

18.    Upon a finding that the sponsor engaged in sanctionable conduct as defined by the regulations, the agency may impose "lesser" sanctions, including a "letter of reprimand." *Id.* § 62.50(b). The Department, however, maintains a practice and policy of "seldom propos[ing] formal sanctions without first engaging in informal discussions seeking to bring the sponsor into voluntary compliance." Exchange Visitor Program – Sanctions and Termination, 72 Fed. Reg. 62112, 62114 (Nov. 2, 2007). Rather than resort to formal sanctions, the Department will often provide a sponsor information and guidance concerning sponsorship best practices to help the sponsor improve its program.

19.    A "Letter of Concern," however, is not included in the Department's sanctioning regulations and the Department has intentionally, arbitrarily, and capriciously, issued "Letters of Concern" to ACEO's members in this case in order not to be bound by its own regulations, not to meet their own regulatory obligations, and to thwart ACEO's members' ability to defend themselves and their reputations – all in violation of ACEO's members' right to due process.

20.    This is not the first lawsuit against Defendants in this case regarding the Defendants' arbitrary and capricious administrative behavior.  The Ninth Circuit Court of Appeals recently found arbitrary and capricious behavior regarding the sanctioning practices of the Department under circumstances that are nearly indistinguishable from the practices at issue in this case.  *See* ASSE International, Inc. v. Pompeo, 802 Fed. Appx. 234 (9th Cir. 2020).  In response to this decision the Department has elected to effectively abandon its existing "Letter of Reprimand" sanction regulations adopted through APA notice and comment and substitute a "Letter of Concern" process that was never announced to sponsors or even formally adopted as an administrative policy.

08727/93133-NES

21.     Sponsors subject to "lesser" sanctions are permitted to submit a one-time paper response "in opposition to or mitigation of the sanction" which "may include additional documentary material." 22 C.F.R. § 62.50(b)(2). The agency may then "modify, withdraw, or confirm such sanction." *Id*. If the sanctions are confirmed, "[t]he decision of the Office is the final Department decision[.]" *Id*. § 62.50(b)(3). No such opportunity for review is provided for with regard to the "Letters of Concern" issued to and that imposing sanctions upon this ACEO's members in this case.

22.     Lesser sanctions may form a predicate component of future sanctions against a program sponsor. One "[r]eason[] for sanctions" under the EVP regulations is where a sponsor has "[e]videnced a pattern of failure to comply with one or more provisions of this Part." 22 C.F.R. § 62.50(a)(2). Likewise, a program sponsor may be placed on probation where the Department finds that it has engaged in "a pattern of violation of regulations such that further violations could lead to suspension or revocation of the sponsor's Exchange Visitor Program designation, or other sanctions as set forth herein." *Id*. § 62.50(b)(1)(ii). A formal reprimand, moreover, comes with a proviso that "repeated or persistent violations of the regulations in this part may result in suspension or revocation of the sponsor's Exchange Visitor Program designation, or other sanctions as set forth herein." *Id*. § 62.50(b)(1)(i).

23.     The "Letters of Concern" referenced herein were not issued pursuant to any validly adopted regulation or policy.

24.     In addition, the "Letters of Concern," which are a sanction in-and-of themselves, impose these sanctions based upon "incidents" that do not exist, or do not rise to sanctionable levels.

08727/93133-NES

25.     In addition, the Office of Private Sector Exchange has violated the Administrative Procedure Act by enacting an unannounced moratorium on the designation of new intern and training sponsors, and upon the program expansion of existing sponsors, including ACEO's members.

26.     This unannounced moratorium constitutes a fraud on ACEO's members that have paid substantial fees to the Office of Private Sector Exchange expecting the service for which they have paid but which the Office of Private Sector Exchange had no intention of providing to ACEO's members when the Office took such payments.

The Department's Online "Sanctioned Sponsors" List

27.     The gravity of the Department's sanctions against ACEO's members is substantially magnified by the Department's practice and policy of maintaining a list of sanctioned sponsors, which was published on the Department's J-1 visa website. The online list included the sponsor's name, affected program category, date of imposition, nature of the sanctions, and list of the regulatory provision(s) the Department has found the sponsor to have violated.  After years of being prominently displayed, this list is not currently found on the Department's webpage. Nevertheless, the Department has made no announcement as to why the sanctioned sponsor list has been temporarily taken down and when it will again be posted.

28.     ACEO's members, like all program sponsors, depend for their success on maintaining a network of program participants, volunteers, and host organizations. The Department encourages these parties to consult the J-1 visa website where it has previously and likely will again post its list of sanctioned sponsors. Given the nature of the agency's actions in this case, publication of the "Letters of Concern" and the sanctions set out therein on a publicly

08727/93133-NES

posted list would destroy the considerable business goodwill ACEO's members have accumulated, and irretrievably stigmatize their reputation in the EVP community.

29.    Public posting of the Department's sanctions decision in this case and its issuing "Letters of Concern" would have potentially disastrous reputational and financial consequences for ACEO's members.

### III. PARTIES

30.    Plaintiff ACEO is non-profit corporation organized under the laws of the State of Washington. ACEO's members are small business entities, as defined by the Small Business Administration, which act as sponsors in connection with the Department's EVP. ACEO's principal place of business is in Dyersburg, Dyer County, Tennessee, where its President is located.

31.    Defendant MIKE POMPEO is the Secretary of the Department of State. He is sued in his official capacity. As the Secretary of the Department of State, he oversees the actions and has ultimate responsibility for the actions of the Department of State officers in imposing sanctions on ACEO's members.

32.    Defendant CARL RISCH is the Assistant Secretary, Bureau of Consular Affairs. He is sued in his official capacity. In his capacity as Assistant Secretary, he is responsible for the oversight of the Kentucky Consular Center and the training and supervision of its employees and contractors as referenced herein.

33.    Defendant MARIE ROYCE is the Assistant Secretary of the Bureau of Educational Affairs in the Department of State. She is sued in her official capacity. In her capacity as Assistant Secretary, she has the ultimate responsibility for oversight of the Exchange Visitor Program.

08727/93133-NES

34.    Defendant MATT LUSSENHOP is the Principal Deputy Assistant Secretary, Bureau of Educational and Cultural Affairs. He is sued in his official capacity. In his capacity as Assistant Secretary, he is the direct supervisor of Defendant KEVIN SABA, and is thus responsible for the day-to-day operations of the Office of Private Sector Exchange.

35.    Defendant KEVIN SABA is the Managing Director, Office of Private Sector Exchange. He is sued in his official capacity. In his capacity as Managing Director, he has the responsibility for the day-to-day administration of the Exchange Visitor Program.

36.    Defendant UNITED STATES DEPARTMENT OF STATE is the agency responsible for administering the Exchange Visitor Program. The Department of State maintains the ultimate responsibility within the federal government for imposing sanctions on ACEO's members as a Program Sponsors.

## IV. JURISDICTION

37.    The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), as it arises under the constitution and laws of the United States, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*. In addition, this Court has jurisdiction under 28 U.S.C. § 2201(a) (Declaratory Judgment Act). This action is also brought under 28 U.S.C. § 1346 (United States as a defendant).

38.    Further, the Exchange Visitor Program is not subject to the foreign affairs function exception of the Administrative Procedure Act under the circumstances of this case. See *ASSE Intern., Inc. v. Kerry*, 803 F.3d 1059, 1070 (9th Cir. 2015).

39.    Attempts by ACEO members to exhaust their administrative remedies through higher level review of the illegal practices of the Office of Private Sector Exchange described herein went unanswered. By letter dated August 19, 2019 to Assistant Secretary Marie Royce

08727/93133-NES

and copied to Principal Deputy Assistant Secretary Matt Lussenhop, ACEO members sought review of the illegal issuance of the "Letters of Concern" referenced herein and requested that such letters be retracted.  A copy of the referenced letter is attached hereto as **Exhibit C** and is hereby referred to and incorporated herein by reference.  Defendants did not reply to such letter or offer any assistance to ACEO members in response to such letter. ACEO members could find no other administrative avenue of review and accordingly seek judicial review of these issues, having exhausted all known administrative remedies pursuant to 22 C.F.R. § 62.50(b)(3), or otherwise.

40.    In this regard, the August 2019, decision to issue the "Letters of Concern" imposing sanctions against ACEO's members is the final State Department decision. There is no administrative appeal available from the imposition of such sanctions.

### III. VENUE

41.    Venue properly lies in the Western District of Tennessee, Eastern Division, pursuant to 28 U.S.C. § 1391(e) and 5 U.S.C. § 703, since ACEO has its principal place of business in Dyersburg, Dyer County, Tennessee.

### V.  CAUSES OF ACTION

<u>Count I:</u>

<u>Arbitrary and Capricious Action in Violation of the APA</u>

42.     ACEO hereby incorporates by reference the allegations contained in paragraphs 1-41 of this Complaint as if the same were set forth verbatim herein.

43.    Defendants' practices, policies, rules, criteria, interpretations of law, and conduct referenced herein violate the regulations at 22 C.F.R. § 62 *et seq.* and the Administrative Procedure Act ("APA") and should be set aside pursuant to 5 U.S.C. § 706(2)(A) as arbitrary,

08727/93133-NES

capricious, an abuse of discretion, and otherwise not in accordance with law, and pursuant to 5 U.S.C. § 706(2)(D), as without observance of procedure required by law.

44.    The Department's decision to sanction ACEO's members ignored the Department's own regulatory framework and relied upon data that was flawed and unlawfully collected by an agency that was not legally authorized, nor properly equipped, trained, or supervised in the collection of such data.

45.    The unlawful nature and known deficiencies of this data collection directly undermine the putative findings upon which the Department based its sanctioning of ACEO's members.

46.    Nevertheless, the Department insists upon sanctioning ACEO's members as set forth in the unlawfully issued "Letters of Concern," which sanctions will significantly impair ACEL's members' ability to continue their participation in the Program.

47.    The Department's blind reliance upon the data collection compiled by the Kentucky Consular Center in issuing is "Letters of Concern" and sanctions against ACEO's members is arbitrary and capricious.  The Department knew that such data collection was flawed at the time that it issued its "Letters of Concern."  The EVP regulations charge the *Department of State* with determining when a sponsor has engaged in conduct that warrants sanctions, and it is unlawful for the agency to fail to conduct its own investigation while outsourcing the basis of its decision-making to a separate, unauthorized administrative division of the agency, which, in turn, relied upon untrained and improperly supervised contractors in ostensibly gathering information.

08727/93133-NES

## Count II:

Due Process Violation

48.    ACEO hereby incorporates by reference the allegations contained in paragraphs 1-47 of this Complaint as if the same were set forth verbatim herein.

49.    ACEO's members have several protectable interests giving rise to a right to due process. ACEO's members have a liberty and property interest in their business goodwill and reputation. These interests will be irrevocably damaged if the Department sanctions ACEO's members as set out in its "Letters of Concern."

50.    In addition, the regulatory provisions which ACEO's members are charged with violating circumscribe the Department of State's authority in a manner that constrains the Department's discretion, giving rise to a protectable property interest.

51.    These interests are magnified by the fact that the undocumented sanctions form part of ACEO's members' permanent file, and can be used as a predicate for adverse action by the Department against ACEO's members in the future, including the imposition of additional penalties implicating ACEO's members' capacity to operate as a program sponsor. As stated by the Department, these "Letters of Concern" will also be considered in future requests for sponsors' program expansion and in connection with possible sponsor program reductions, all of which can adversely affect ACEO's members' future revenue, in which they have a vested property interest.

52.    In addition, the "Letters of Concern" themselves are not provided for by any validly adopted rule or regulation of the Department and were not promulgated and adopted after public comment in violation of the Administrative Procedure Act.

08727/93133-NES

# VI. ATTORNEY'S FEES

53.    As a result of Defendants' unlawful actions, Plaintiff was required to retain the undersigned counsel and pay counsel reasonable fees and expenses. Because Defendants are not substantially justified in pursuing their actions, Plaintiff is entitled to recover legal fees and all costs and expenses under the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412.

# VII. RELIEF REQUESTED

WHEREFORE, ACEO respectfully requests this Court to enter judgment in its favor and issue the following Order:

a. Declare Defendants' actions to be a direct violation of the Administrative Procedure Act; arbitrary and capricious, an abuse of discretion, and not otherwise in accordance with law and a direct violation of Plaintiff's and its members' Due Process rights arising under the Fifth Amendment;

b. Review the challenged "Letters of Concern" dated on or about August 13, 2019 and renewed on or about September 16, 2020 and declare that they are arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with the law;

c. Temporarily and Permanently enjoin the Defendants, their agents, successors and all other persons acting in concert with them from enforcing or applying against the Plaintiff or its members the terms of the "Letters of Concern" issued on or about August 13, 2019 and renewed on or about September 16, 2020;

d. Temporarily and Permanently enjoin Defendant Carl Risch, his agents, successors and all other persons acting in concert with them from issuing any further reports or conducting any further Kentucky Consular Center investigations regarding ACEO's members pending an

08727/93133-NES

independent review of the training and supervision of the Kentucky Consular Center's

employees and/or contractors in connection with their conduct of such investigations;

      e. Award ACEO its attorney's fees and costs; and

      f. Grant such other relief as the Court may deem just, equitable, and proper.


                  Respectfully submitted,

                  RAINEY, KIZER, REVIERE & BELL, P.L.C.


                  By: s/ Michael L. Mansfield
                    NATHAN E. SHELBY, BPR #26583
                    MICHAEL L. MANSFIELD, BPR #18781
                    Attorneys for Plaintiff
                    209 East Main Street
                    P. O. Box 1147
                    Jackson, TN  38302-1147
                    731/423-2414
                    nshelby@raineykizer.com
                    mmansfield@raineykizer.com

08727/93133-NES

# **<u>EXHIBIT A</u>**

ARTICLES OF INCORPORATION

OF

The Association of Cultural Exchange Organizations

The undersigned, for the purposes of forming a corporation under the nonprofit laws of the State of Washington, RCW 24.03, hereby adopts the following Articles of Incorporation.

ARTICLE I

The name of this corporation is The Association of Cultural Exchange Organizations

ARTICLE II

This corporation shall have perpetual existence.

ARTICLE III

A.  This corporation is a nonprofit, public benefit corporation and is not organized for the private gain of any person. It is organized under the nonprofit public benefit corporation law for charitable purposes.

B.  The specific purpose of this corporation is to provide cultural exchange organizations, sending and receiving organizations an opportunity to advocate, educate and promote educational exchange programs

ARTICLE IV

The name and address in the State of Washington of this corporation's initial agent for services of process is:

Jeff Laband
4530 Union Bay Place NE, Suite 214
Seattle, WA 98105

The street address of the registered office, which is also the address of the registered:

4530 Union Bay Place NE, Suite 214
Seattle, WA 98105

ARTICLE V

A.  This corporation is organized and operated exclusively for charitable purposes within the meaning of Section 501(c) (3) of the Internal Revenue Code.

B.  Notwithstanding any other provisions of these Articles, this corporation shall not carry on any other activities not permitted to be carried on (a) by a corporation exempt from federal income tax under Section 501 (c) (3) of the Internal Revenue Code, or (b) by a corporation, contributions to which are deductible under Section 170 (c) (2) of the Internal Revenue Code.

C.  No substantial part of the activities of this corporation shall consist of carrying on propaganda, or otherwise attempting to influence legislation, and this corporation shall not participate or intervene in any political campaign (including the publishing or distribution of statements) on behalf of any candidate for public office.

ARTICLE VI

There shall be four (4) directors serving as the initial Board of Directors. Their names and addresses are as follows:

Jeff Laband
4530 Union Bay Place NE, Suite 214
Seattle, WA 98105

David N. Dahl
205 North Church Street
Dyersburg, TN 38025

Debra Martin
30725 River Crossing
Bingham Farms, MI 48025

Patti Chiacchiero
55 New Orleans Road
210 Fountain Center
Hilton Head Island, SC 29928

ARTICLE VII

The property of this corporation is irrevocably dedicated to charitable purposes, and no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer, or member thereof, or to the benefit of any private person. Upon the dissolution or winding up of this corporation, its assets remaining after payment, are provisioned for payment of all debts and liabilities of this corporation, shall be distributed to a nonprofit fund, foundation, or corporation which is organized and operated exclusively for charitable purposes, and which has established its tax exempt status under Section 501 © (3) of the Internal Revenue code.

ARTICLE VIII

The name and address of each incorporator is as follows:

Jeff Laband
4530 Union Bay Place NE, Suite 214
Seattle, WA 98105

David N. Dahl
205 North Church Street
Dyersburg, TN 38025

Debra Martin
30725 River Crossing
Bingham Farms, MI 48025

Patti Chiacchiero
55 New Orleans Road
210 Fountain Center
Hilton Head Island, SC 29928

IN WITNESS WHEREOF, the incorporator has affixed his signature on this _11th_ day of June, 2020.

Jeff Laband

## CONSENT TO APPOINTMENT AS REGISTERED AGENT

I, Jeff Laband, hereby consent to serve as Registered Agent, in the State of Washington, for the corporation herein named. I understand that as agent for the corporation, it will be my responsibility to receive service of process in the name of the corporation: to forward all mail to the corporation; and to immediately notify the office of the Secretary of State in the event of my resignation or of any change in the registered office address of the corporation for which I am agent.

Dated this _____ day of June, 2020.

**Notary:**

STATE OF _Washington_

COUNTY OF _King_

On this day personally appeared before me, <u>Jeff Laband,</u> to me known to be the individual described in and who executed the within and foregoing instrument on page 2 of 3, and acknowledged that he signed the same as his free and voluntary act and deed, for the uses and purposes therein mentioned.

Given under my hand and seal of office this _11th_ day of _Jun_, 20 _20_ .

Printed Name: _Chia-Wei Liu_

Notary Public residing at _Seattle, WA_

My Commission Expires:

_7/16/2023._

CHIA-WEI LIU
MY COMM. EXP. 07-16-2023
NOTARY
PUBLIC
COMM. NO. 210071
STATE OF WASHINGTON

08727/93133-NES

# **EXHIBIT B**

**BYLAWS**

**OF**

# Cultural Exchange Organizations (ACEO)

ARTICLE I

Membership

The non-profit corporation shall have no members.

ARTICLE II

Board of Directors

Section 1.  Powers and Qualifications  The affairs of the corporation shall be managed by the board of directors.

Section 2.  Number and Term  The number of directors of the corporation shall be not less than one. There is no limit to the number of directors, unless otherwise provided for herein or by determination of the board of directors. The board of directors, by amendment of these Bylaws, may increase or decrease the number of directors, provided that no decrease in number shall have the effect of shortening the term of any incumbent. If there is only one director elected at the first annual election of directors, the term of office of that director shall be three years.  If there are additional directors elected at the first annual election of directors, the directors shall be divided into three (3) classes, the first class to serve a term of one (1) year, the second to serve a term of two (2) years, and the third to serve a term of three (3) years thereafter.  Each such director shall hold office for the term for which each is elected and qualified.  The term of office of a class of director after those elected at the first annual meeting shall be three (3) years unless otherwise specified.  Election may occur via remote voice conference. If there are no candidates other than the sitting director(s) for the position(s) to be filled, the sitting director(s) shall continue in their position(s) for one year increments.

Section 3.  Executive Committee  The board of directors, by resolution adopted by a majority of the directors in office, may designate and appoint an executive committee.  Such a committee shall consist of two (2) or more directors and shall have and exercise such authority of the board of directors in the management of the corporation as may be specified in said resolution.  However, no such committee shall have the authority of the board of directors to amend, alter or repeal they Bylaws; elect, appoint or remove any member of any such committee or any director or officer of the corporation; amend the Articles of Incorporation; adopt a plan of merger or adopt a plan of consolidation with another corporation; authorize the voluntary dissolution of the corporation or revoke proceedings then adopt a plan for the distribution of the assets of the corporation not in the ordinary course of business; or amend, alter or repeal any resolution of the board of directors which by its terms provides that it shall not be amended, altered or repealed by such committee.  The designation and appointment of any such committee and the delegation of authority to it shall not operate to relieve the board of directors or any individual director of any responsibility imposed upon it, him or her by law.

Section 4.  Election  After the first annual meeting, the member or members of one class of directors shall be elected at each annual meeting, to hold office until the expiration of the term of office of the class of directors into which elected, and until his, her or their respective successors are elected and qualified.

August 19, 2019

Honorable Marie Royce, Assistant Secretary
Bureau of Educational and Cultural Affairs
U.S. Department of State
2205 C Street, NW
Washington, DC  20547

Re:  **Request for Immediate Administrative Relief**

Dear Secretary Royce:

I am writing to you on behalf of the Small Sponsors Working
Group[1] to request that you direct the immediate retraction of all
"letters of concern" sent this week by the Office of Private
Sector Exchange to Exchange Visitor Program training and intern
sponsors.  As discussed below, these letters: 1) are a violation
of the most basic protections provided the public by the
Administrative Procedures Act; 2) rely upon a flawed data
collection conducted by the Kentucky Consular Center; and, 3)
impose a substantial and unwarranted financial and resource
burden on smaller sponsors that are long-standing exchange
programming partners of the Department of State.  The Small
Sponsors Working Group also requests that you initiate a
management audit of the administrative practices of the Office
of Private Sector Exchange.

**Administrative Procedures Act Violations**

In 2014 the Office of Private Sector Exchange began the practice
of issuing "Letters of Concern" to program sponsors regarding
basic program administration issues.  However, no regulation
authorizes these letters of concern and nor did the Office of
Private Sector Exchange bother to announce this new practice,
how it would implement this practice or what it seeks to
accomplish in issuing such letters.  Informally, sponsors were
advised that letters of concern are a "junior sanction" outside
of the sanction regulations set forth at 22 CFR 62.50.  Sponsors
were also advised that these letters of concern would be
considered in future administrative matters such as program
expansion or re-designation. Program sponsors further regard
"Letters of Concern" as a Departmental pretense to single out
individual sponsors by conjuring and otherwise creating

---

[1] All members of the Working Group are small business entities as defined by the Small
Business Administration and E.O.

potentially sanctionable incidents, when no incident, regulatory
or otherwise, exists.

Pursuant to the Administrative Procedures Act (APA) a "letter of
concern" is by definition a sanction. See: 5 U.S.C. 551, et
seq. Imposing a sanction requires a Department regulation that
provides the Department with regulatory authority to impose the
sanction, which in the case of a "letter of concern", does not
exist – because the Office of Private Sector Exchange neither
amended the existing sanctions regulations set forth at 22 CFR
62.50, nor received permission from any proper authority to do
so.

Given the content of the "letters of concern" issued this week
the Office of Private Sector Exchange can no longer suggest that
a "letter of concern" is not a sanction. These letters declare
and otherwise insinuate that the sponsor has violated Exchange
Visitor Program regulations (adjudication under the APA) and
order specific remedial action, i.e. a site visit, host
training, and a report to the Office of Private Sector Exchange
– all of which impose a substantial financial burden, especially
upon the smaller sponsor.

No due process whatsoever has occurred or been provided for in
the "letter of concern" sanctioning scheme. Accordingly, we
request that you direct the immediate retraction of these
"letters of concern" and direct the Office of Private Sector
Exchange to issue no further "letters of concern" until such
time as a regulation authorizing such a sanction has been
adopted by the Department through the APA notice and comment
process.

**Flawed Information Collection**

From June 2018 through January 2019 the Kentucky Consular Center
conducted a data collection under which it contacted several
hundred U.S. corporate entities that served as host
organizations for intern and training program participants. The
Working Group believes this data collection was not lawfully
conducted as we can find no record whereby the Office of
Management and Budget approved this data collection as required
by the Paperwork Reduction Act.

Further, Working Group members have confirmed that information
was often collected from incorrect individuals having no
knowledge of or involvement with the Exchange Visitor Program
and were not authorized to speak on behalf of their host
organizations regarding the Exchange Visitor Program. The
Working Group questions the qualifications of those carrying out

the data collection, and has also confirmed that the individuals
conducting the data collection were inconsistent in the
questions they asked the individuals at the host organizations
who just happened to answer the phone.

We are left to conclude that the individuals conducting this
data collection were not adequately qualified, trained or
supervised, and that the data collection process was so flawed
as to render all information collected worthless for
programmatic review purposes, the consideration or imposition of
any sanction, or demand for remedial action.

Importantly, the Office of Private Sector Exchange has firsthand
knowledge of the inaccuracies that lard the Kentucky Consular
Center work product.  Office staff members have conducted site
visits to employers identified in the Kentucky Consular Center
work product as allegedly problematic. Yet when they inspected
the hosting facility they could find no issues, problems, or
regulatory violations.

**Unwarranted Financial Burden**

The "letters of concern" sent this week direct sponsors to
conduct site visits to specified hosting entities and provide
these hosting entities with training regarding the terms and
conditions of the Exchange Visitor Program and verify that these
host entities meet the requirements of the Exchange Visitor
Program.  The "letters of concern" advise these small business
sponsors that they have 90 days to complete these site visits
and explicitly threaten further administrative sanctions should
the sponsor fail to comply.

To comply with this directive we anticipate that more than 325
site visits and "training sessions" will be required at an
average cost of some $3,000 per visit.  Thus, without an
adequate basis to form a belief as to whether a regulatory
violation has actually occurred, and in violation of the
Administrative Procedures Act, the Office of Private Sector
Exchange is imposing what is tantamount to a financial penalty
in excess of one million dollars on small sponsors that conduct
the Department's cultural exchange programs. Such an imposition
of penalties significantly damages a smaller sponsor's ability
to carry out its regulatory duties for its current participants
on a day-to-day basis.


**Audit of Administrative Practices**

In 2014 the Department reorganized the Office of Private Sector Exchange and established three subordinate offices reporting to the Deputy Assistant Secretary for Private Sector Exchange as well as a policy and program support unit.  The specific authorities and functions of each subordinate office and the support unit are detailed at 1 FAM 346.

The Office of Private Sector Exchange has elected to ignore the organizational structure and authorities specified in this FAM section.  This failure to comply with the organizational structure and authorities specified in the FAM undermines the internal controls put in place by the Department, and results in work products that simultaneously damage the Department's reputation and compromise program effectiveness.

For the Department's, sponsors' and participants' benefit, the operations of the Office of Private Sector Exchange must be brought into compliance with FAM requirements. The public has the absolute right and expectation of governmental compliance with its own governing rules and regulations. FAM provisions are published to provide for governmental accountability and transparency.

Of particular concern to the sponsor community is the drafting of regulations and, as discussed above, the imposition of sanctions based upon "incidents" that do not exist, or do not rise to sanctionable levels. The Office of Program Administration, not the policy and program support unit, has been delegated the authority to draft and clear regulatory documents and design, administer, and analyze participant surveys.  This is not how the Office Private Sector Exchange is conducting its business.  Simply put, the policy and program support unit is operating as a line office rather than a support unit.  This causes significant confusion – externally and evidently internally.

Evidence of ineffectiveness and waste is best demonstrated by the fatally flawed proposed regulation[2] published in January 2017 and a very complicated and very biased 80 question "voluntary survey" sent to intern and trainee program alumnus last week – without meaningful input sought from the sponsor community. Fortunately, this survey is so complicated that it virtually guarantees that few, if any, former program participants may respond, thus invalidating any "results".  We believe that this

---

[2] The Working Group submitted a formal comment regarding this proposed regulation.  This comment is attached as an exhibit to this letter for the purpose of demonstrating Office of Private Sector Exchange ineffectiveness.

is yet another lost, and thus substantially costly, opportunity for the Department to have partnered with sponsors to demonstrate trust and transparency, by together, fairly and objectively, examining and demonstrating program effectiveness.

Further evidence of the chaos and Administrative Procedures Act violations in the Office of Private Sector Exchange is the current unannounced moratorium on the designation of new intern and training sponsors or the program expansion of existing sponsors.  This unannounced moratorium constitutes a fraud on those entities that have paid a substantial fee to the Office of Private Sector Exchange expecting the service for which they have paid but which the Office of Private Sector Exchange had no intention of providing to them when they took the money.

This unlawful administrative practice is also undermining the foreign policy objectives of the Bureau and its leadership, specifically in regard to the recent memorandum of understanding between the United States and the Government of Portugal. Intern and training sponsors that wish to participate in the implementation of this February 2019 bilateral agreement are prevented from doing so due to the unexplained and unpublished moratorium on program expansion.

**Looking Ahead**

The members of the Small Sponsors Working Group have always supported the Bureau's cultural exchange mission and many of its members have partnered with the Bureau for more than 30 years. Importantly, The Working Group strongly supports the Bureau's efforts to offer only the highest quality programming and will always stand ready to assist the Bureau in implementing these efforts.  However, the subject matter expertise to ensure this quality lies with the sponsor community and the Office of Private Sector Exchange makes little effort to enlist the resources and expertise of the private sector sponsors often electing to conduct its business under a shroud of secrecy and in an adversarial manner.

We are hopeful that this practice will change.


Respectfully submitted,


David N. Dahl
The Foundation for Worldwide International Student Exchange

Deb Martin
Dynamic Global Exchange

Jeff LaBand
Northwest International Student Exchange/CICD

Patti Chiacchiero
International Educational Exchange (IEE)

Section 5. <u>Removal from office</u> The board of directors may convene for a conference at its discretion to remove individual(s) from or appoint individual(s) to board positions. Removal of board members from their elected position(s) may take place at any time during such board members' terms in office with a simple majority vote of those so convened.

Section 6. <u>Vacancies</u> The board of directors shall have power to fill any vacancy occurring in the board and any directorship to be filled by reason of an increase in the number of directors by amendment to these Bylaws or as otherwise stated herein. Directors elected to fill their respective vacancies shall be elected or appointed for the unexpired terms of their respective predecessors who were in office.

ARTICLE III

Meetings

Section 1. <u>Annual Meetings</u> The annual meeting of the board of directors for election of directors to succeed those whose terms expire, and for the transaction of any other business as may properly come before the meeting, shall be held each year at the registered office of the corporation, or virtually, on or before the 15th day of December, at 9:00 a.m. PDT, but in case such date shall be a legal holiday, the meeting shall be held at the same hour and place on the next succeeding day not a holiday - or on any other day mutually agreed upon by the board of directors.

Section 2. <u>Special Meetings</u> Special meetings of the board of directors may be held at any place and time, whenever called by the president, secretary, or any one director, and announced timely and previous to the entire membership for such meeting.

Section 3. <u>Notice of Meetings</u> Notice of the time and place of any meeting of the board of directors shall be given by the secretary, or by the director or directors calling the meeting, by email or by personal communication over the telephone or otherwise, at least three (3) days prior to the date on which the meeting is to be held. Attendance of a director at any meeting shall constitute a waiver of notice of such meeting, except where the director attends a meeting for the purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened.
Neither the business to be transacted nor the purpose of any meeting of the board of directors need be specified in the notice or any waiver of notice of such meeting.

Section 4. <u>Quorum</u> Those attending such board of directors meeting shall constitute a quorum for the transaction of business. The act of the majority of directors present at a meeting at which such quorum is present shall be the act of the board of directors. At any meeting of the board of directors at which such quorum is present, any business may be transacted, and the board may exercise all of its powers. A director who is present at such a meeting shall be presumed to have assented to the action taken at that meeting unless the director's dissent or abstention is entered in the minutes of the meeting or the director files his or her written dissent or abstention to such action with either the person acting as secretary of the meeting before the adjournment of the meeting or by registered mail to the secretary of the corporation immediately after the adjournment of the meeting.

Section 5. <u>Meetings Held by Telephone or Similar Communications Equipment</u> Members of the board of directors or its committees may participate in a meeting of the board or such committees by means of a conference telephone or similar communications (e.g. Skype, Zoom, etc.) equipment by means of which all persons participating in the meeting can hear each other at the same time and participating by such means shall constitute presence in person at a meeting.

ARTICLE IV

Actions of Written Consent

Any corporate action required or permitted by the Articles of Incorporation or Bylaws, or by the laws of the State of Washington, to be taken at a meeting of the board of directors (or its committees) of the corporation, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the directors entitled to vote with respect to the subject matter thereof, or verbally voted on/agreed to and documented in meeting minutes. Such consent shall have the same force and effect as a unanimous vote, and may be described as such.

## ARTICLE V

Waiver of Notice

Whenever any notice is required to be given to any director of the corporation by the Articles of Incorporation or Bylaws, or by the laws of the State of Washington, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be equivalent to the giving of such notice.

## ARTICLE VI

Officers

Section 1. Officers Enumerated The officers of the corporation shall be one or more president(s), one or more vice presidents, a secretary, a treasurer, and such other officers and assistant officers as may be deemed necessary by the board of directors, each of whom shall be annually elected by the board of directors, and shall serve until their term ends or their successors are duly elected and qualified as described elsewhere herein. Any two or more offices may be held by the same person, except the offices of president and secretary. In addition to the powers and duties specified below, the officers shall have such powers and perform such duties as the board of directors may prescribe.

Section 2. The President The president must be a director of the corporation, and shall exercise the usual executive powers pertaining to the office of president, such as presiding at meetings of the board of directors and committees exercising any authority of the board, signing and executing deeds, bonds, contracts, and other obligations, or instruments, in the name of the corporation, etc.

Section 3. The Vice President Shall have the same powers as the president.

Section 4. The Secretary Shall have the same powers as the president and shall keep records of the proceedings/meetings of the board of directors and when requested by the president to do so.

Section 5. The Treasurer The treasurer shall have the same powers as the president and shall have the care and custody of and be responsible for all funds, finances and investments of the corporation and shall cause to be kept regular books of account. The treasurer shall cause to be deposited all funds and other valuable effects in the name of the corporation in such depositories as may be designated by the board of directors, and shall perform all of the duties incident to the office of treasurer.

Section 6. Vacancies Vacancies in any office arising from any cause may be filled by the board of directors at its discretion at any regular or special meeting.

Section 7.  <u>Salaries</u> All positions are volunteer. If at any future time a position or positions may become compensated, the salary of any such paid officer and/or agent of the corporation shall be fixed by deliberation of the board of directors.

Section 8.  <u>Removal</u> Any officer elected or appointed, as well as any agent, may be removed by the board of directors whenever in its judgment the best interests of the corporation are thereby served.

ARTICLE VII

<u>Administrative and Financial Provisions</u>

Section 1.  <u>Fiscal Year</u> The last day of the fiscal year of the corporation shall be December 31.

Section 2.  <u>Loans Prohibited</u> No loans shall be made by the corporation to any officer, agent, or to any director.

Section 3.  <u>Corporate Seal</u> The board of directors may provide for a corporate seal that shall have inscribed thereon the name of the corporation, the year and state of incorporation and the words "corporate seal."

Section 4.  <u>Books and Records</u> The corporation shall keep at its registered office, its principal office in this state, or at its secretary's office if in this state, the following:  current articles and bylaws; correct and adequate records of accounts and finances; a record of officers' and directors' names and addresses; minutes of the meetings of the board and any minutes which may be maintained by committees of the board.  Records may be written or electronic if capable of being converted to writing.  All books and records of the corporation may be inspected by any director, or his or her agent or attorney, for any proper purpose at any reasonable time.

Section 5.  <u>Amendment of Bylaws</u> These Bylaws may be altered, amended or repealed by the affirmative vote of a majority of the board of directors at any annual or special meeting of the board.

Section 6.  <u>Rules and Procedure</u> The rules of procedure at meetings of the board of directors of the corporation shall be the rules contained in Roberts' Rules of Order on Parliamentary Procedure, newly revised, so far as applicable and when not inconsistent with these Bylaws, the Article of Incorporation or by any resolution or other procedure agreed to by the board of directors.

<u>CERTIFICATION</u>

(Name) _____, being a president of the Association of Cultural Exchange Organizations (ACEO), hereby certifies that the foregoing Bylaws were duly adopted by the board of directors on _June 12_ 2020.

_David N Dahl_____
(Printed Name)

08727/93133-NES

# **EXHIBIT C**

February 27, 2017

**Via electronic mail @ Jexchanges.state.gov**

Mr. Mark Taplin
Assistant Secretary of State, Acting
Bureau of Educational and Cultural Affairs
U.S. Department of State
SA-5, Fifth Floor
2200 C Street, NW
Washington, DC 20522-0505

    Re: Summer Work Travel Program Proposed Rule
     Public Notice: 9522
     RIN 1400-AD14

Dear Secretary Taplin:

These comments are responsive to the Department of State's request for comments regarding proposed amendments to existing Summer Work Travel program regulations as published in the Federal Register on January 12, 2017.  These comments represent views of sponsors that are small business entities and target the Department's Regulatory Analysis of burden it developed in support of its proposed rule.  Additional comments regarding program specific provisions of the proposed rule are submitted under separate cover.

The statutorily required Regulatory Analysis the Department has published in support of its sweeping proposed regulatory amendments is far too broad-reaching and lacks appropriately objective and accurate research, analysis and consideration of the proposed amendments' short and long term appropriateness, efficacy and deleterious impacts on the SWT program. We agree that re-regulation may be necessary to improve what must be improved, as well as to create new, *category-appropriate* opportunities for all program stakeholders (students, host entities, sponsors, local communities, ECA, etc.) However, we strongly disagree that the Department summarily alter virtually the entire body of SWT regulations without the appropriate research, analysis and consideration of the rule's short and long term appropriateness, efficacy, program-fostering vs program-damaging aspects.

Absent in the proposed rule are adequate consideration and suggested best practices about how sponsors shall comply with all permutations of the new rule in an affordable and prudent manner, in a manner that does not put out of reach participation for all but the most privileged and financially endowed classes of students, and in a manner that does not itself bring disrepute to this long-standing desirable and affordable program.

Therefore, the proposed rule must be withdrawn in its entirety, reevaluated and re-drafted in a manner that includes representative stakeholders from the Sponsor,

U.S. Department of State
Proposed Rule:  RIN 1400-AD14
February 27, 2017
Page 2 of 11

Host Entity, and Participant communities – in a financially responsible manner, and in a manner consistent with the mission of the Fulbright-Hays Act upon which the SWT Program is based.

**Summary**

1. This proposed rule directly impacts more than 23,000 small businesses, not 41 as stated in the Department's Regulatory Analysis (calculation below). This is a significant administrative error.   An error of this magnitude calls into question the accuracy of all statements and assumptions made by the Department staff in its Regulatory Analysis.  Accordingly, the Department's proposed rule should be withdrawn.

2. This proposed rule, as documented below, imposes additional cost burdens on business entities in excess of $45,664,959.  The Department's cost burden estimate of $9,340,629 is miscalculated to such a degree that it cannot properly be used in any meaningful and accurate cost benefit analysis. Accordingly, the Department's proposed rule should be withdrawn.

3. Pursuant to White House directive dated January 20, 2017 this proposed rule should have been either withdrawn or the comment period extended until March 21, 2017.  By ignoring this White House directive the Department has compromised the ability of more than 23,000 small businesses impacted by this rule to provide meaningful comment.  We note that this refusal is particularly difficult for the Department to justify: the Department staff worked on this rule for four years but refused to allow the affected public 22 additional days to comment.  During a meeting on October 21, 2016, the Department disclosed to the Small Sponsors Working Group that they selected the length of the comment period. This refusal clouds the legal underpinnings of any future final rule that may flow from this proposal. Accordingly, the Department's proposed rule should be withdrawn.

4. The President's Executive Order on Reducing Regulation and Controlling Regulatory Costs, dated January 30, 2017 substantially alters the rulemaking environment in which any final rule flowing from the comments submitted to this proposed rule will be promulgated.  Given the inaccurate Regulatory Analysis advanced by the Department staff, future attempts to go forward with review of comments submitted regarding the rule would violate both accepted regulatory practice and statutory protections afforded the public. Accordingly, the Department should mitigate the waste of government resources that further pursuit of this rulemaking would involve, withdraw this proposed rule and begin again.

U.S. Department of State
Proposed Rule:  RIN 1400-AD14
February 27, 2017
Page 3 of 11

**Analysis**

The Department's Regulatory Analysis consistently underestimates both the time requirements associated with proposed regulatory burdens and the per hour wage costs associated with these burdens.  In its assignment of burden hours and costs the Department assumes these burdens to be clerical in nature rather than programmatic.  This assumption by the Bureau of Educational and Cultural Affairs Office of Private Sector Programs demonstrates a lack of practical understanding regarding the mechanics of exchange programming and the wage structure of the exchange industry.

In this proposed rule the Department staff proposes to impose an additional regulatory burden upon 41 program sponsors that will require sponsor expenditure of not less than 26 million dollars.  These proposed rules will also require the additional expenditure of not less than 19 million dollars by private sector employers.

Collectively, sponsors generate less than 79 million dollars in program revenues.  Calculation of program revenues is straightforward and can be easily validated with sponsor revenue information in your staff's possession.  Fee revenue received by sponsors ranges from $550 to $700 dollars for self-placing participants and $800 to $950 dollars for participants that are placed with employers by sponsors.  As the Department proposes to prohibit future participant self-placement, the fee revenue calculation becomes quite simple: $875 (the average fee charged) multiplied by 90,000 participants equals $78,750,000 in fee revenue.

To cover the costs associated with this proposed rule, sponsors will, on average, need to increase the program fee charged to participants by $289 ($26,000,000 divided by 90,000 equals $289), a 33% increase.

**-- Small Business Entities**

While many program participants are in fact employed by large business entities -- often well-known employers with multiple business premises located throughout the United States – the vast majority of employers involved in the program are in fact small businesses.

The Department staff states that there are 26,000 employers participating in the Summer Work Travel program.  Small Business Administration and United States Census Bureau statistics demonstrate that 89% of U.S. business entities are small businesses with less than 20 employees and that these small business entities account for 49% of private sector employment.  By applying Small Business Administration and Census Bureau statistics to the Summer Work Travel employer

U.S. Department of State
Proposed Rule:  RIN 1400-AD14
February 27, 2017
Page 4 of 11

population the Department staff would have found that the United States
Government would classify more than 23,000 of these employers as small business
entities (26,000 multiplied by .89 equals 23,140).  Further extrapolation of these
statistics reveals that the majority of Summer Work Travel participants are actually
employed by small businesses.

As stated the Department staff in the Supplementary Information section of this
proposed rule, over the past four years this staff has directed and documented more
than 4200 site visits to program employers. Due to the nature of these visits, the
Department staff must be aware of the predominance of small business entities in
the Summer Work Travel employer.

**-- Calculation of Hourly Wage**

The $26 weighted wage calculation utilized in the Regulatory Analysis is not correct,
is arbitrary, and is improperly applied in cost burden calculations.  It is unclear why
the Department staff elected to utilize an inappropriate, generalized, Bureau of
Labor Statistics salary calculations when they possess first-hand knowledge of the
salary structure associated with the programming of exchange visitors.

Rather than apply the known per hour cost of labor paid to Bureau of Educational
and Cultural Affairs clerical, programming, and supervisory employees -- and to
exchange program contracting agencies acting on the Bureau's behalf – the
Department staff has arbitrarily and capriciously utilized Bureau of Labor Statistics
salary figures for entry-to-junior-level or "other services" staff working on
administering daily program activities.  Contrary to the position taken by the
Department staff, small business entities do not assign contract negotiations,
communications with the government, responsibility for controlled government
documents used to facilitate the entry into and presence of foreign nationals into the
United States, and conflict or dispute resolution to entry or junior level staff.   Not
surprisingly, other entities engaged in exchange programming such as the
Department of State, its contractors, and the higher education community do not
assign these duties to entry or junior level staff.  Application of an arbitrarily chosen
wage per hour standard clearly demonstrates the initial shortcomings in the
Department's cost burden regulatory analysis.

The Department need look no further than its own wage structure to determine the
correct hourly wage rate for program coordinators, program officers, and
supervisory staff and their private sector counterparts engaged in exchange
programming.  This comparison is required as the government wage structure is
designed to ensure that government pay is commensurate with private sector wages
for comparable positions.  Sponsor employees are engaged exchange programming
activities that directly parallel their government counterparts employed in the

U.S. Department of State
Proposed Rule:  RIN 1400-AD14
February 27, 2017
Page 5 of 11

programming offices of the Bureau of Educational and Cultural Affairs.  Based on the
clear alignment of job duties between government employees and their private
sector counterparts, the correct wage per hour calculations are as follows:

| Position | Hourly Average Wage | With Benefits |
|---|---|---|
| GS-5 Program Coordinator (clerical): | $15.57 | $19.06 |
| GS-12 Program Officer (mid-level) | $34.22 | $42.09 |
| GS-15 Program Supervisor | $56.56 | $69.57 |

These per hour wage calculations are based on the average hourly wage paid
government employees in these pay grades and are derived from the 2017 Wage
Chart published by the U.S. Office of Personnel Management.

Having now established the correct wage per hour calculations we turn to the
application of these wage rates to the burden imposed.

**-- Calculation of Regulatory Burden**

The Department's Regulatory Analysis estimates the time burden and hourly wage
costs of thirteen different new or amended programming activities it proposes to
impose upon the private businesses engaged in the programming of Summer Work
Travel participants.  Each of the Department burden estimates are not supported by
the facts, fail to consider all aspects of the work required to ensure sponsor
compliance, and ignore prior burden estimates provided by those actually
responsible for programming these participants.

For clarity, correct burden calculations are set forth below in the order they are
presented in the proposed rule.

*Transparency*:  The Department proposes that sponsors provide to participants a
sample budget detailing fees and estimated costs that a participant will pay.  As
written, this regulation may actually suggest that sponsors will need to prepare
some 90,000 individual budget estimates reflecting the varying costs of food,
housing, and transportation across the United States and the varying wages the
participant will receive.  However, the Department's Supplementary Information
declares this is not the Department's intent and that a more generalized
geographical approach is actually contemplated.  Exchange participants are working
in all 50 States and to meet this transparency requirement all 41 sponsors will
potentially need to examine the 574 Metropolitan Statistical Areas ("MSA")
identified by the Office of Management and Budget and formulate a projected
budget based upon the wages, cost of food, housing, and transportation associated
with each MSA.  Budget formulation is not clerical work and will thus require

U.S. Department of State
Proposed Rule:  RIN 1400-AD14
February 27, 2017
Page 6 of 11

utilization of program officer level staff.  Assuming each sponsor will be required to
prepare 100 budgets the cost of this requirement will be 1.5 hours per budget at
$42.09 per hour multiplied by 100 budgets, multiplied by 41 sponsors, for a total of
$258,853.

*Sponsor Screening for eligibility and selection*:  To perform this activity a staff person
must retrieve a file, open it, review it for accurateness and completeness, evaluate
whether the participant is in fact eligible for program participation, make a record
of their review, raise questions regarding eligibility with their supervisors, seek
additional information if necessary, close the file and secure it appropriately.  This
work can be performed at the clerical level and will require on average 1.0 hour of
staff time.  The additional cost burden is thus 1.0 hour multiplied by 90,000
participants multiplied by $19.06 for a total cost of $1,715,400.

*Participant's submission of application*:  Most exchange visitor participants would be
surprised to learn that the government values their time at $1 per hour.  Without
any basis to dispute this government determination we accept the government's
calculation that this cost burden is 1.0 hour multiplied by 90,000 participants
multiplied by $1 per hour for a total cost of $90,000.

*Exchange visitor pre-placement at host entities*:  The Department has not properly
assessed the regulatory burden associated with the placement of a participant at a
host entity.  Importantly, the Department makes no mention whatsoever of the
regulatory burden placed upon the host facility itself, a significant oversight, as the
majority of host entities are in fact small businesses.  At a minimum, a host facility
will devote no less than an additional 2.0 hours to the review, completion,
transmittal, and filing of documents necessary to participate in this program and
employ program participants. These functions are not clerical in nature and are
performed at the private sector equivalent of a program officer or above.  This new
burden falls disproportionately on the approximately 23,000 small business entities
that participate in this program.  The burden on host entities is 2.0 hours multiplied
by 90,000 participants multiplied by $42.09 per hour for a total host entity cost of
$7,576,200.

Further, the Department ignores the cost to program sponsors associated with
placement.  Sponsors must identify potential host entities, brief them regarding the
benefits of program participation, vet them, transmit questionnaires regarding the
particulars of the placement, review the responses, evaluate the particulars of the
job opportunity, document that they have performed each of these functions and file
these documents.  Sponsors spend no less than 2.0 man-hours in completing these
tasks.  This cost burden is incurred annually and is not static as suggested by the
Department.  Further, these tasks are not clerical and are performed at the private
sector equivalent program officer level.  Thus the burden on sponsors associated

U.S. Department of State
Proposed Rule: RIN 1400-AD14
February 27, 2017
Page 7 of 11

with placement are an additional 2.0 hours multiplied by 90,000 participants multiplied by $42.09 per hour for a total sponsor cost of $7,576,200.

*Exchange visitor host re-placement*: We do not understand why the Department staff elected to estimate the number of participants that are re-placed during their program participation. This information is collected in the SEVIS database. Given this lack of governmental specificity we rely upon information shared amongst sponsors and estimate that the number of participants that will seek to be "re-placed" during the course of their program participation is 10,000, which represents just over 10 percent of all placements. Further, participants are permitted to have second jobs, obligating sponsors to vet these additional employers. Approximately, 15% (13,500) of all participants have second jobs, a practice approved by the Department. The additional costs of "re-placing" and vetting second jobs are included in the "Form DS-7007" burden discussions set forth below.

*Sponsor vetting of host entities*: A discussion of this cost burden is included in the "Pre-placement" subpart set forth above.

*Appropriate and affordable housing*: The Department requires that sponsors only authorize placements that include options for safe and affordable housing accommodations, in a safe location, within an undefined reasonable distance to the participant's work location, that is not isolated nor difficult to access, in reasonable proximity to commercial infrastructure and accessible to regular, safe, and affordable local transportation. These housing and local transportation options must be identified before a placement is approved. This requires documented investigation and evaluation by the sponsor. A properly trained clerical may perform this identification and evaluation of housing and transportation options. This same level of investigation and evaluation will be required regardless of whether the host entity provides housing or the participant identifies their own housing. Conservatively, an additional 2.0 hours per placement will be required to meet this regulatory requirement and the burden on sponsors is thus 2.0 hours multiplied by 100,000 (including re-placements) multiplied by $19.06 for a total cost of $3,812,000.

*The Form DS-7007*: The Department introduces a new form designed to provide greater detail regarding the participant's employment and housing. Completion of this form requires the involvement of the sponsor, the host facility, and the participant. This form will be completed, reviewed, transmitted, and filed by all three parties involved in the transaction. No less than 1.0 hour of clerical staff time and no less that 1.0 hour of program officer staff time will be required for each of the 115,000 (including re-placements and second jobs) Forms DS-7007 that this regulation will require. Thus the combined additional burden on sponsors and host entities will be 1.0 clerical hour multiplied by 115,000 Forms DS-7007 multiplied by

U.S. Department of State
Proposed Rule:  RIN 1400-AD14
February 27, 2017
Page 8 of 11

$19.06 per hour plus 1.0 program officer hour multiplied by 115,000 forms multiplied by  $42.09 per hour for a total burden of $7,031,350.

*Orientation documentation*:  Delivery of orientation documentation requires actual delivery to the participant and documentation that the material was in fact delivered.  This work is clerical in nature and requires .5 hour of staff time.  Thus the additional cost imposed by this requirement is .5 hours multiplied by 90,000 participants multiplied by $19.06 per hour for a total cost of $857,700.

*Cross-Cultural activities*:  The Department has grossly understated the cost of providing these activities as both clerical and program officer level staff will be involved in planning and execution of these events.  The Department estimates that four such events will be required for each of the 90,000 program participants and that 2.0 hours will be devoted to implementation and 4.0 hours (a total of six hours per event) will be required for planning.  Therefore, the Department estimates that 26,000 entities (host entity or sponsor) will expend 24 man-hours (six hours per event times four events) to meet this new regulatory requirement.  Exclusive of time devoted to these events by program officer level staff, the new cost imposed by this requirement is at a minimum, 24 hours multiplied by $19.06 per hour multiplied by 26,000 entities for a total cost of $11,893,440.

*Exchange Visitor Monitoring and Assistance*:  The Department estimates that .5 hours will be required to monitor and assist program participants.  Given the importance that the Department has placed upon monitoring participants, this estimate of time is not realistic.  For example, a "problem" placement will require an average use of at least eight hours of a supervisory level employee's time.  With an estimated 900 "problem" placements per year (one percent of programmed participants) the monitoring costs for these participants alone is 8 hours at $69.57 per hour times 900 participants for a total burden of $500,904.  Further, the Department requires monthly contact (for a total of 4 months) with each participant and that such contact be documented.  Each contact will require an additional .25 man-hours at the clerical level. Thus the cost of this regulation is 1.0 hour (.25 x 4) at $19.06 per hour multiplied by 90,000 participants for a total burden of $1,715,400.  In total ("problem" cases plus routine monitoring), this regulatory burden is $2,216,304.

*Sponsor Use and Vetting of Foreign and Domestic Third Parties*:  The Department's estimate of sponsor costs associated with vetting and contracting with third party entities – not hosting entities – is grossly understated. The utilization of third party service providers is a contractual matter requiring investigation, negotiation, and monitoring.  To establish a domestic third party relationship sponsors collect more than 13 separate documents.  To establish a third party relationship with a foreign entity more than 20 separate documents are required.  These matters are handled only at the supervisory staff level.  An extremely conservative estimate of the

U.S. Department of State
Proposed Rule:  RIN 1400-AD14
February 27, 2017
Page 9 of 11

additional total man-hours devoted to investigating, vetting, entering into, monitoring and reporting a third party agreement is 20 man-hours.  Given the Department's estimate that sponsors will enter into 1,900 domestic and foreign third party agreements on an annual basis, the cost of these regulatory requirements are 20 hours at $69.57 per hour multiplied by 1,900 for a total cost of $2,643,660.

*Reporting Requirements*: The burden associated with reporting requirements is complex and involves far more than the simple submission of the report itself. These additional costs, i.e., data collection, documentation, and analysis are included in the cost burdens discussed above.  Simply submitting the required reports will require 1 hour of supervisory staff time at $69.57 per hour multiplied by 41 sponsors for a total cost of $2,852.

**Conclusion**

Having reviewed this proposed rule, the Department staff has not successfully articulated the exact problem, discussed in detail alternative means to solve said problem, and proposed the least burdensome regulation necessary to address the identified problem. The Department must discuss in detail the least burdensome regulations possible necessary to address the identified problem.

Instead the Department staff has migrated regulatory provisions that are specific to the au pair, intern, and secondary school exchange programs into this proposed rule without an adequate basis, explanation, or justification for the need to do so.  With fourteen different categories of exchange participation a one size fits all approach is inappropriate as such an approach disregards the participant demographics and program mechanics that underlie these differing exchanges.

The proposed rule published on January 12, 2017 declared that the Summer Work Travel program has 90,000 participants and all burden cost estimates were based on this number.  We believe that Department records will actually demonstrate that there are more than 100,000 annual participants.  We respectfully request that the Department examine and explain this discrepancy.

A future Work and Travel program in the USA under the proposed rule-making is unsustainable. We understand that the Department's intention is to remedy certain anecdotal or potentially problematic issues.  Given the broad-reaching and frequent inaccuracies within the Regulatory Analysis and proposed rule, as well as a demonstrated absence of applied industry-specific business operations and management knowledge the Department specifically applied to create the proposed regulations, this rule making must be withdrawn in its entirety, reevaluated and re-drafted.

U.S. Department of State
Proposed Rule:  RIN 1400-AD14
February 27, 2017
Page 10 of 11

As a first step toward accomplishing a redrafting of the regulations that reflect best practices for all stakeholders, we respectfully suggest that the Department first identify the specific problem(s) it intends to remedy via rule making, and then create a timely and appropriate regular schedule of  meetings that bring representative stakeholders together with the Department that includes sponsors, employers and participants, the sole purpose of which is to discuss and hopefully agree upon best practices and appropriate ways to help implement effective new regulations and solutions.

Only the collaboration across all exchange community stakeholders can ensure a thriving, transparent and successful program into the future, and eliminate the program-harming risks and suffering that the currently-proposed massive cost burdens will cause. Implementing such a regular schedule of meetings or similar collaborative process, will ensure program sustainability and affordability for future generations and that any new regulations can reflect accurately-assessed needs of the exchange community moving forward.


Finally, the burden estimates presented in this comment are based upon the Department staff's declaration regarding program size.  We believe the actual burden cost to be 11 percent higher than stated above, i.e., in excess of fifty million dollars, but are forced to work from the data set forth in this flawed Regulatory Analysis and its inaccurate statement of program size.

Respectfully submitted,

Small Sponsors Working Group

 By:

Patti Chiacchiero
International Educational Exchange, Inc. (IEE)

Nancy Crouch
Signature Services

Dave Dahl
WISE Foundation

Anton Dvorishin
American Exchange Organization, Inc. (AmerEx)

U.S. Department of State
Proposed Rule:  RIN 1400-AD14
February 27, 2017
Page 11 of 11

Jeff LaBand
Center for International Career Development

Deb Martin
Dynamic Global Exchange

Debra Moody
A Cultural Exchange Service (ACES)

Don Moody
Life Adventures

Marina Onaca
World Wide Cultural Exchange, Inc. (WWCE)

Emily Reppen
ERDT Work & Travel Program

Valerie Rimmer
American Work Experience